# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-0031V

| | |
|---|---|
| MICHELLE MUSSEHL,<br><br>　　　　　　　　Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>　　　　　　　　Respondent. | Chief Special Master Corcoran<br><br>Filed: July 12, 2023 |

*David John Carney*, Green & Schafle LLC, Philadelphia, PA, *for Petitioner.*

*Mitchell Jones*, U.S. Department of Justice, Washington, DC, *for Respondent.*

### DECISION AWARDING DAMAGES[1]

On January 4, 2021, Michelle Mussehl filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that she suffered a shoulder injury related to vaccine administration ("SIRVA"), a defined Table injury, after receiving an influenza ("flu") vaccine administered on October 18, 2019. Petition at 1, ¶¶ 3, 19. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU"). Respondent conceded entitlement, but the parties were unable to resolve damages on their own,[3] so I ordered briefing on the matter.

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

[3] After approximately two months of damages discussions, Petitioner rejected Respondent's counteroffer and requested that I determine the appropriate amount of damages. Status Report, filed Nov. 23, 2022, ECF No. 32.

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount **$60,000.00 for actual pain and suffering.**

I. **Legal Standard**

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[4] *Hodges v. Sec'y of*

---

[4] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

*Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by a decision of the Court of Federal Claims several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). *Graves* instead emphasized the importance of assessing pain and suffering by looking to the record evidence specific to the injured individual, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595. Under this approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap. Although *Graves* is not controlling of the outcome in this case, it provides reasoned guidance in calculating pain and suffering awards.

## II.     Prior SIRVA Compensation Within SPU[5]

### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of July 1, 2023, 3,304 SPU SIRVA cases have resolved since the inception of SPU on July 1, 2014. Compensation was awarded in 3,211 of these cases, with the remaining 93 cases dismissed.

1,834 of the compensated SPU SIRVA cases were the result of a reasoned ruling that petitioner was entitled to compensation (as opposed to a settlement or concession).[6] In only 173 of these cases, however, was the amount of damages *also* determined by a special master in a reasoned decision.[7] As I have previously stated, the written decisions

---

[5] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

[6] The remaining 1,377 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Because multiple competing factors may cause the parties to settle a case (with some having little to do with the merits of an underlying claim), these awards from settled cases do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

[7] The rest of these cases resulting in damages after concession were either reflective of a proffer by Respondent (1,632 cases) or stipulation (29 cases). Although all proposed amounts denote *some* form of agreement reached by the parties, those presented by stipulation derive more from compromise than

setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[8]

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

|  | **Damages Decisions by Special Master** | **Proffered Damages** | **Stipulated Damages** | **Stipulated[9] Agreement** |
|---|---|---|---|---|
| **Total Cases** | *173* | *1,632* | *29* | *1,377* |
| **Lowest** | $40,757.91 | $22,500.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,203.12 | $62,825.18 | $90,000.00 | $38,134.81 |
| **Median** | **$92,299.83** | **$83,039.25** | **$130,000.00** | **$55,000.00** |
| **3rd Quartile** | $125,000.00 | $111,475.61 | $162,500.00 | $80,803.17 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B.   Pain and Suffering Awards in Reasoned Decisions

In the 173 SPU SIRVA cases in which damages were the result of a reasoned decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $215,000.00, with $90,000.00 as the median amount. Only seven of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[10]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six

---

instances in which Respondent formally acknowledges that the settlement sum itself is a fair measure of damages.

[8] Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

[9] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[10] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

months in one case. In cases with more significant initial pain, petitioners usually experienced this greater pain for three months or less. Most petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. Except in one case involving very mild pain levels, the duration of the SIRVA injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in ROM. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 133 PT sessions - occasionally spanning several years, and multiple cortisone injections, were required in these cases. In six cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### III.    The Parties' Arguments

Petitioner requests $75,000.00 for her pain and suffering. Petitioner's Brief in Support of Damages ("Brief") at 1, 27, filed Nov. 30, 2022, ECF No. 34. She emphasizes her immediate pain – reported five weeks post-vaccination, and consistent symptoms for the duration of her injury - calculated as lasting more than two and a half years. *Id.* at 25-26. She favorably compares the facts and circumstances in her case with those suffered by the petitioners in *Niemi, Black, Decoretz,* and *Boyd*[11] - decisions featuring past pain and suffering awards ranging from $75,000.00 to $80,000.00. Brief at 20-22, 25-26.

Respondent, by contrast, deems Petitioner's injury as mild and her treatment as limited, and thus proposes the lesser sum of $37,500.00 for actual/past pain and

---

[11] *Niemi v. Sec'y of Health & Hum. Servs.,* No. 19-1535V, 2022 WL 3135258 (Fed. Cl. Spec. Mstr. July 5, 2022) (awarding $75,000.00 for pain and suffering); *Black v. Sec'y of Health & Hum. Servs.,* No. 20-0777V, 2022 WL 3335594 (Fed. Cl. Spec. Mstr. July 12, 2022) (awarding $75,000.00 for pain and suffering); *Decoretz v. Sec'y of Health & Hum. Servs.,* No. 19-0391V, 2021 WL 2346468 (Fed. Cl. Spec. Mstr. May 7, 2021) (awarding $75,000 for past pain and suffering); *Boyd v. Sec'y of Health & Hum. Servs.,* No. 19-1107V, 2021 WL 4165160 (Fed. Cl. Spec. Mstr. Aug. 12, 2021) (awarding $80,000.00 for pain and suffering).

suffering. Respondent's Response to Petitioner's Brief in Support of Damages ("Opp.") at 2, 6, 10-11, filed Feb. 1, 2023, ECF No. 36. Emphasizing the intermittent nature of Petitioner's pain, limited treatment - including several two- to three-month long gaps, and injury duration - characterized as one year,[12] he insists Petitioner's case is distinguishable from those she cites. *Id.* at 6; *see id.* at 7-9 (discussing specific cases). Respondent instead proposes as better comparable decisions *Ramos, Rayborn, Norton,* and *Clendaniel*,[13] in which petitioners received awards ranging from $40,000.00 to $60,000.00. Opp. at 9-11. Emphasizing the slightly longer period of treatment in *Ramos*; the more significant treatment (although for less time) in *Rayborn*; the numerous PT sessions and steroid injections required in *Norton*; and more severe symptoms and treatments (two cortisone injections and arthrocentesis procedures), plus slightly longer duration involved in *Clendaniel*, he maintains Petitioner's award should be slightly less than the lowest award of $40,000.00 paid to the *Ramos* petitioner. *Id.*

In her reply brief, Petitioner criticizes Respondent's characterization of her SIRVA injury as "minimally debilitating and requir[ing] only conservative treatment." Petitioner's Reply in Support of Brief at 2 ("Reply"), filed Feb. 13, 2023, ECF No. 37. Emphasizing the lengthy delays before seeking treatment in *Rayborn* and *Ramos*, the relief obtained by a steroid injection in *Norton*, and three-month long gap in treatment in *Clendaniel,* she argues that her proposed comparable cases are more analogous to her circumstances. *Id.* at 3-4. Throughout, Petitioner reiterates her assertion that her injury lasted at least two and a half years. *Id.* at 2-3, 5, 7. She also stresses the difficulties she experienced working as a dental hygienist, and the limitations presented by the COVID Worldwide Pandemic which began shortly after her injury. *Id.* at 6-7.

### IV.   Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

---

[12] Respondent discounts the chiropractic visits Petitioner attended in 2022, noting they occurred eighteen months after last sought treatment in October 2018, "long after [P]etitioner had engaged legal representation and filed her Vaccine Program Petition." Opp. at 6 n.2.

[13] *Ramos v. Sec'y of Health & Hum. Servs.,* No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021) (awarding $40,000.00 in pain and suffering); *Rayborn v. Sec'y of Health & Hum. Servs.,* No. 18-0226V, 2020 WL 5522948 (Fed. Cl. Spec. Mstr. Aug. 14, 2020) (awarding $55,0000.00 in pain and suffering); *Norton v. Sec'y of Health & Hum. Servs.,* No. 19-1432V, 2021 WL 4805231 (Fed. Cl. Spec. Mstr. Sept. 14, 2021) (awarding $55,000.00 in pain and suffering); *Clendaniel v. Sec'y of Health & Hum. Servs.,* No. 20-0213V, 2021 WL 4258775 (Fed. Cl. Spec. Mstr. Aug. 18, 2021) (awarding $60,000.00 in pain and suffering).

When performing this analysis, I review the record as a whole to include the medical records, declarations, affidavits, and all other filed evidence, plus the parties' briefs and other pleadings. I consider prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I base my determination on the circumstances of this case.

A thorough review of the medical records reveals that Ms. Mussehl suffered a moderate to mild SIRVA injury, with treatment lasting approximately twelve months. Consistently reporting pain levels ranging from three to six but often exhibiting full ROM,[14] she received little relief from three occupational therapy ("OT") sessions attended in January and early February 2020, less than three months post-vaccination. Exhibit 6 at 6-8 (discharge sheet indicating no goals met). Following a month of rest – including time off from work,[15] Petitioner made better progress during seven PT sessions and home exercises in March through early May 2020.[16]

Although Respondent deems significant the limited treatment Petitioner received (Opp. at 6), there is another reason why more invasive options, such as a steroid injection – a procedure often offering at least temporary relief - were not pursued. The record in this case actually suggests that Petitioner did not suffer the typical SIRVA injury (in which a vaccine is injected into the bursal space, leading to irritation of the structures in the shoulder joint). Rather, based upon Petitioner's continued reports of pain, MRI results showing a lack of rotator cuff pathology, Petitioner's petite size, and the location of the vaccine injection, her orthopedist opined that it was more likely "that the flu vaccine with its antigen had been injected into the area around [her axillary] nerve or even into the nerve." Exhibit 5 at 168. Therefore, he did not believe a steroid injection would help alleviate her pain. *Id.* And Petitioner was unable to complete the needle portion of EMG

---

[14] When Petitioner first sought treatment for her left shoulder pain, she rated its level as four our of ten. Exhibit 3 at 50. At her initial PT session on January 3, 2020, Petitioner reported pain at levels ranging from three to five. Exhibit 6. At her first orthopedic appointment on February 13, 2020, Petitioner rated her pain as five out of ten, indicating the pain was constant and varied from three to six. Exhibit 5 at 155. However, she was observed to have full ROM. *Id.* At her next orthopedic appointment one week later, Petitioner again assessed her pain at a level of five, describing an "[a]chy and weakness feeling." *Id..* at 169. Throughout this time, Petitioner was prescribed hydrocodone-acetaminophen and lidocaine patches for her pain. *Id.* at 152, 180, 186, 193.

[15] Although Petitioner continued to work during OT sessions in January and February 2020 (Exhibit 6 at 8), she took time off work thereafter. On February 20, 2020, she discussed the importance of "taking some time off from work in order to allow her arm to rest" with her orthopedist. Exhibit 5 at 168. In early March 2020, she obtained documentation from her orthopedist to justify her time. *Id.* at 186. On March 19, 2020, her orthopedist indicated Petitioner could return to work. *Id.* at 198.

[16] By March 2020, Petitioner was reporting improvement in ROM and pain, assessing her pain at a level of three to four. Exhibit 6 at 19, 20 (records from PT sessions on March 3 and 13, 2020).

testing performed in September 2020, leading more credence to the orthopedist's supposition. Exhibit 7 at 79-81.

Petitioner cites a slight increase in pain severity – from three to four – that she reported on May 1, 2020, as evidence of lack of improvement. Brief at 8, 24. However, in medical records from PT sessions on April 29 and May 1, 2020, Petitioner clearly attributes the additional soreness she was experiencing to yardwork she had performed. Exhibit 6 at 21. Additionally, Petitioner fails to even mention her March 19, 2020 orthopedic visit when she reported *some* improvement and a desire to return to work. Brief at 3-10 (Petitioner's factual history). There is evidence showing Petitioner returned to work in early May 2020. *See* Exhibit 6 at 21 (April 29th statement indicating she was returning to work in a week).

Undeniably, Petitioner's treatment throughout the remainder of 2020 was hindered by the COVID Pandemic occurring at that time. Still, at her last orthopedic appointment on October 29, 2020, Petitioner reported continued improvement. Exhibit 8 at 25. However, it appears she was suffering some continued symptoms as well, since at this time she asked if acupuncture would be helpful. Answering in the affirmative and encouraging Petitioner "to call with questions or concerns," the orthopedist instructed Petitioner "to return to activities as tolerated and resume . . . her weight-lifting program" and to "follow-up as needed." *Id.*

Petitioner maintains that she continued to experience symptoms throughout 2021 and early 2022, but the record does not support her assertion. Petitioner did not seek treatment again until a chiropractic appointment in April 2022, almost 18 months after her last treatment, and 15 months after the petition was filed in this case - a gap in treatment which especially undermines her contention. Exhibit 10 at 4-15. And the ongoing Pandemic would not explain or fully justify a lack of treatment during the remainder of 2021 and 2022.

Moreover, at the only additional treatment sought - chiropractic visits on April 16 and May 7, 2022 - Petitioner provided a slightly different description of pain than previously provided. She now reported pain in her trapezius and upper and middle thoracic region. Exhibit 10 at 13, 16. Assessing her as suffering from muscle spasms, the chiropractor expressed skepticism regarding a causal link between vaccination and these current symptoms. *Id.* at 14, 17.

Given the atypical nature of Petitioner's injury, the consistent but moderate levels of her pain, and the slower recovery due primarily to rest and PT, it is difficult to find

8

another case which offers an exact comparison. Still, I find that *Welsh*[17] – involving a past pain and suffering award of $55,000.00, and not cited by either party - provides helpful guidance. However, Petitioner's award should be slightly higher. The *Welsh* petitioner waited twice as long as Ms. Mussehl to seek treatment for her injury, relied on over the counter medication to treat her pain, and required slightly less PT. *Welsh,* 2021 WL 4612654, at *2-4.

Similarly, one of the cases cited by Respondent – *Rayborn,* which also involved an award of $55,000.00 - offers a good comparison. Although the *Rayborn* petitioner delayed seeking treatment for more than 100 days, she suffered similar pain levels, experienced moderately limited ROM, and attended a comparable amount of PT. *Rayborn,* 2020 WL 5522948*,* at *11-12. Furthermore, as a nurse practitioner, it is understandable that the *Rayborn* petitioner would attempt to self-treat for a longer period than most petitioners. *Id.* at *2.

Thus, I find $60,000.00 – an amount slightly greater than the awards in *Welsh* and *Rayborn* - to be appropriate.

## Conclusion

For all of the reasons discussed above, and based on consideration of the record as a whole, **I award Petitioner a lump sum payment of $60,000.00, representing compensation for actual pain and suffering,[18] in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a) of the Vaccine Act. *Id.*

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[19]

**IT IS SO ORDERED.**

                                                                            **s/Brian H. Corcoran**
                                                                            Brian H. Corcoran
                                                                            Chief Special Master

---

[17] *Welsh v. Sec'y of Health & Hum. Servs.,* No. 18-0660V, 2021 WL 4612654 (Fed. Cl. Spec. Mstr. Sept. 2, 2021).

[18] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[19] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.